## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

CHIQUITA SPEARS, AS REPRESENTATIVE
OF THE ESTATE OF TRAVIS STEVENSON,
CARRINGTON JACKSON
TRAVIS WATSON
PHYLLICIA CARTER
CASSANDRA CARTER

                                              CIVIL ACTION

VERSUS

                                              NO. 17-105-JWD-EWD

SIDNEY J. GAUTREAUX, III, SHERIFF,
ET AL.

### RULING AND ORDER

        This matter is before the Court on a *Motion for Summary Judgment* ("*Motion*") filed by

Sidney J. Gautreaux, III, Sheriff of East Baton Rouge Parish, Lieutenant Michael Birdwell,

Detective Shannon Broussard, Detective Charles Montgomery, Detective Scott Henning,

Detective Christopher Masters, and Sergeant Verner Budd (collectively "Defendants"). (Doc.

63.) Plaintiffs, Chiquita Spears, as Representative of the Estate of Travis Stevenson, Carrington

Jackson, Travis Watson, Phyllicia Carter, Cassandra Carter ("Plaintiffs") filed a response in

opposition of the *Motion*. (Doc. 75.) Defendants filed a reply. (Doc. 78.) Oral argument is not

necessary. The Court has considered the facts, the applicable law, the arguments raised by the

parties, and for the reasons expressed below, grants the *Motion*.

### FACTUAL BACKGROUND

        On February 23, 2016, Deputy Kreig Thomas ("Dy. Thomas") responded to a 911 call at

8236 Innovation Park Drive, Apartment A in Baton Rouge. (Doc. 63-3 at 14.) When he arrived

at the apartment, Dy. Thomas made contact with Kimula Porter, ("Ms. Porter") who had called

911, after her boyfriend Travis Stevenson, who resided with her, got upset with her, physically

assaulted her and her daughter Brianna Triplett by spraying pepper spray into their faces, hitting the bedroom wall with a beer bottle causing a hole in the wall, and taking her wallet. (*Id.*) Ms. Porter told Dy. Thomas that Mr. Stevenson had left the residence in a white or cream colored four door Cadillac car. (*Id.*)

While Dy. Thomas was still at the apartment, Mr. Stevenson called Ms. Porter. (*Id.*) Mr. Stevenson told Dy. Thomas that he did not want to meet with the deputies. (*Id.*) Mr. Stevenson also stated that he was going to jump off of the Mississippi River Bridge—indicating that he would hurt himself. (*Id.*) Mr. Stevenson also told the responding deputies that he did not want to go back to jail. (*Id.*) Sargent Verner Budd ("Sgt. Budd") also made contact with Mr. Stevenson via telephone, where he again advised that he did not want to talk and was going to jump off of the Mississippi River Bridge. (*Id.* at 21.) The responding deputies concluded that charges for domestic violence should be filed and sought Mr. Stevenson to lawfully arrest him. (*Id.* at 14.) Sgt. Budd contacted East Baton Rouge Sherriff's Office Detectives and advised them of the situation. (*Id.*)

After preparing an "Exigent Circumstance" request form with Mr. Stevenson's cellular provider, to request Global Positioning Satellite data, the responding deputies began to ping Mr. Stevenson's cell phone. (*Id.*) East Baton Rouge Sheriff's Office deputies also began canvasing the bridges near the Mississippi River in an attempt to arrest Mr. Stevenson and keep him from hurting himself. (*Id.*) Detective Christopher Masters was one of the deputies canvassing the area. (*Id.*) It was eventually determined that Mr. Stevenson was located near Terrace Avenue and Eddie Robinson Drive in South Baton Rouge. (Doc. 63-3 at 14.)

Lieutenant Michael Birdwell, ("Lt. Birdwell") located Mr. Stevenson's car parked next to an apartment building on Smith Street, adjacent to Terrace Avenue—over a mile from the

Mississippi River Bridge—and broadcast the location to the other deputies in the area. (Doc. 63-4, *Lt. Birdwell Dep.* at 15:16-16:17.) Mr. Stevenson's car was parked facing the apartment building with an SUV less than four feet from his car on his left. (Doc. 75-1 at 1.) There was a metal pole in front of Mr. Stevenson's vehicle between the vehicle and the apartment building's stairwell. (Doc. 63-4, *Lt. Birdwell Dep.* at 20:23-21:1.) Lt. Birdwell parked his marked Chevrolet Tahoe patrol unit on Smith Street, approximately 10 to 12 feet perpendicular behind Mr. Stevenson's car and shined his spotlight into the car. (Doc. 63-4, *Lt. Birdwell Dep.* at 18:15-18:18.) Lt. Birdwell could not see anyone inside the vehicle when he got there. (*Id.* at 18:12-14.)

Lt. Birdwell got out of his patrol unit and approached Mr. Stevenson's car. (*Id.* at 21:15-19.) He was surprised to see Mr. Stevenson in the vehicle. (*Id.*) Lt. Birdwell knocked on the window, Mr. Stevenson did not acknowledge him, so he knocked again and told him to open the door. (*Id.* at 22:2-7.) Mr. Stevenson looked up at Lt. Birdwell and started the ignition. (*Id.* at 22:7-9.) Lt. Birdwell used the glass breaker on his knife to break the driver's window of the vehicle to extricate him. (Doc. 63-4, *Lt. Birdwell Dep.* at 22:9-19.) Detective Scott Henning ("Det. Henning") arrived while Lt. Birdwell was breaking the window. (Doc. 63-5, *Det. Henning Dep.* at 38:3-5.)

After Mr. Stevenson started his vehicle, he put the vehicle in reverse. (Doc. 63-4, *Lt. Birdwell Dep.* at 23:21-23.) Lt Birdwell yelled that his unit was behind Mr. Stevenson. (*Id.* at 23:25-24:6.) However, Mr. Stevenson reversed and slammed into Lt. Birdwell's patrol unit. (*Id.* at 24:6.) The patrol unit's airbags deployed, and the patrol unit was pushed into a parked car. (Doc. 63-3 at 24; Doc. 63-4, *Lt. Birdwell Dep.* at 25:13-14.) Det. Henning ordered Mr. Stevenson to get out of the car. Mr. Stevenson responded by yelling "Kill me!" (Doc. 63-5, *Det. Henning Dep.* at 44:9-18.)

3

Mr. Stevenson accelerated straight forward towards Lt. Birdwell. (Doc. 63-4, *Lt. Birdwell Dep.* at 27:1-28:9.) Det. Henning thought that Mr. Stevenson was trying to run over Lt. Birdwell and that Lt. Birdwell was going to be injured or killed. (Doc. 63-5, *Det. Henning Dep.* at 50:14-19.) Det. Henning discharged his firearm as Mr. Stevenson drove forward, but his shot did not strike Mr. Stevenson. (Doc. 63-3 at 25.) The shot shattered one of Mr. Stevenson's vehicle's windows, and the glass struck Lt. Birdwell in the arm. (*Id.* at 20.) Lt. Birdwell jumped out of the way of Mr. Stevenson's vehicle. (Doc. 63-4, *Lt. Birdwell Dep.* at 29:18-19.) Mr. Stevenson crashed into the metal pole in front of steps leading into the apartment building and then reversed and hit Lt. Birdwell's unit again. (Doc. 63-3 at 22.)

Detective Shannon Broussard ("Det. Broussard") arrived at the scene and saw Mr. Stevenson back into Lt. Birdwell's patrol unit before accelerating forward and hitting the pole. (*Id.* at 29.) Det. Broussard saw Mr. Stevenson reverse into Lt. Birdwell's patrol unit again and then accelerate forward and reverse. (*Id.*) Det. Broussard discharged 2-3 rounds into the rear driver side tire of Mr. Stevenson's vehicle to stop the vehicle. (*Id.*)

When Detective Charles Montgomery arrived at the scene, his view was blocked by Det. Henning's patrol unit. (Doc. 63-6, *Det. Montgomery Dep.* at 24:22-25:2.) While approaching the scene on foot, Det. Montgomery heard a gunshot. (*Id.* at 25:15-22.) Det. Montgomery observed Mr. Stevenson back into Lt. Birdwell's patrol unit and then accelerate forward with such force that the front wheels lifted off the ground on impact. (Doc. 63-3 at 26.)

When Sgt. Budd arrived at the scene and he saw Lt. Birdwell between the parked SUV and Mr. Stevenson's vehicle. (*Id.* at 29.) He moved closer to Lt. Birdwell to ensure his safety. (*Id.*)

4

The deputies at the scene, Lt. Birdwell, Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd ("Deputies") were all shouting at Mr. Stevenson, identifying themselves as from the Sheriff's office and instructing him to get out and stop the car. (*Id.*) Mr. Stevenson reversed again. At that point, Lt. Birdwell was positioned between the parked SUV, the apartment building and Mr. Stevenson's vehicle and the Deputies believed Lt. Birdwell could have been killed or seriously injured by Mr. Stevenson's accelerating vehicle. (*Id.* at 28.)

Det. Broussard saw Mr. Stevenson put the transmission into drive and thought he was going to accelerate forward. (Doc. 63-3 at 29.) Det. Broussard realized Lt. Birdwell was directly in front of the vehicle and in danger of being struck. (*Id.*) Reacting to this, Det. Broussard fired six or seven rounds at Mr. Stevenson. (*Id.*)

Det. Montgomery saw Mr. Stevenson accelerating forward and shouted at Lt. Birdwell to move or get out of the way, because he believed the vehicle would strike him. (Doc. 63-3 at 26.) Det. Montgomery believed that Lt. Birdwell was frozen and locked in place. (*Id.*) Det. Montgomery fired six rounds at Mr. Stevenson. (*Id.*)

Sgt. Budd also thought Lt. Birdwell was going to be hit by the vehicle accelerating forward. (*Id.* at 28.) He stepped in front of Lt. Birdwell as he saw the vehicle traveling toward them and fired four rounds at Mr. Stevenson. (*Id.*) Lt. Birdwell did not fire his weapon. He was caught off guard and thought that Mr. Stevenson would come to his senses and comply with instructions. (Doc. 63-3 at 22; Doc. 63-4, *Lt. Birdwell Dep.* at 53:5-21.)

Tragically, Mr. Stevenson died from multiple gunshot wounds. (Doc. 63-3 at 23.)

The East Baton Rouge Sheriff's Office contacted the Louisiana State Police Criminal Investigative Division and requested assistance with investigating the officer-involved shooting.

(Doc. 63-3.) Master Trooper Barry Ward investigated the incident. (*Id.* at 32.) The Louisiana

State Police investigation concluded:

> [N]o criminal misconduct on behalf of the deputies involved. Their actions appear to be consistent with what a reasonably prudent officer would do in a similar circumstance. The use of force in this instance appears to be consistent with a person's right to defend another person, who is in reasonably apparent danger of receiving death or great bodily harm. Therefore, the responding deputies reasonably believed the use of deadly force was the necessary intervention to protect another deputy from such injury or death.

(*Id.* at 32.)

## APPLICABLE STANDARD

Pursuant to well-established legal principles, summary judgment is appropriate where

there is no genuine disputed issue as to any material fact, and the moving party is entitled to

judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. *See also Celotex Corp.*

*v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A party

moving for summary judgment must inform the Court of the basis for the motion and identify

those portions of the pleadings, depositions, answers to interrogatories and admissions on file,

together with affidavits, if any, that show that there is no such genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. at 323. If the moving party carries its burden of proof

under Rule 56, the opposing party must direct the Court's attention to specific evidence in the

record which demonstrates that the non-moving party can satisfy a reasonable jury that it is

entitled to a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. This burden is

not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and

unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence. *Little v.*

*Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, Rule 56

mandates that summary judgment be entered against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. at 322. Summary judgment is appropriate in any case where the evidence is so weak or tenuous on essential facts that the evidence could not support a judgment in favor of the non-moving party. *Little v. Liquid Air Corp.*, 37 F.3d at 1075. In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1260, 1263 (5th Cir. 1991).

DISCUSSION

a. *Parties' arguments*

1. Defendants' arguments in support

    A. *Plaintiffs have failed to state a § 1983 claim against Defendants in their official capacities.*

Defendants maintain that Plaintiffs have not alleged sufficient facts and cannot present evidence to establish an official capacity claim under § 1983. (Doc. 63-1 at 12.) Specifically, Defendants argue that the vague and conclusory allegations regarding an isolated case cannot establish a pattern of violations and that the alleged policies, practices, or customs were not the moving force of a constitutional violation. (*Id.*)

As to the allegations regarding a failure to adequately train, supervise, and control, Defendants maintain that Plaintiffs' allegations are not sufficient. Defendants outline that the allegations include that the Sheriff, as a matter of policy and practice, "directly encourages the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference" (*Id.* (citing Doc. 38 at ¶ 28).) Further that the Sheriff's failure to train "included a failure to train in the proper and graduated use of force." (*Id.* (citing Doc. 38 at ¶ 31).)

Defendants argue that Plaintiff's allegations do not show any pattern of similar violations sufficient to invoke liability under § 1983, but instead focus on a single isolated instance of a lack of training or supervision. (*Id.* at 14.) Further, Defendants point to the evidence that shows that each of the Deputies underwent training in firearms and defensive tactics and had the State of Louisiana Peace Officer Standards and Training certification. (*Id.* (citing Doc. 63-7; Doc. 63-8; Doc. 63-9).) As such, this evidence shows that any allegation that the Sheriff failed to adequately train police officers in the use of force is without merit.

Likewise, as to the allegations regarding failure to adequately punish, properly investigate and discipline, Defendants argue that Plaintiffs merely make vague and conclusory allegations that are not sufficient. Specifically, Defendants point to the conclusory allegations that the Sheriff, as a matter of policy and practice: (1) "facilitates the very type of misconduct at issue by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading subordinate deputies, including the Defendant deputies named herein, to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses;" (2) "is aware of, and condones and facilitates by his action, the failure of the East Baton Rouge Parish Sheriff's Department to properly investigate and discipline officers who have engaged in excessive force or otherwise violated the civil rights of citizens;" and (3) "East Baton Rouge Parish Sheriff Deputies accused of excessive force and/or violations of civil rights can be confident that they will not be investigated in earnest, discipline will not be recommended if required, to enforce discipline even where the deputy has engaged in excessive force or otherwise violated the civil rights of citizens" (Doc. 63-1 at 15-16 (citing Doc. 38 at ¶¶ 29-30).)

Defendants argue that Plaintiff's allegations are insufficient to establish liability because the allegations involve only one alleged constitutional violation and Plaintiff cannot establish a

pattern necessary for the Court to infer a custom or policy. Further, that Plaintiffs cannot present evidence to support their allegations regarding a failure to investigate, punish, and/or discipline. (*Id.* at 18.)

Next, as to the allegations regarding the Deputies, Defendants argue that Plaintiffs have not alleged facts to state a § 1983 claim against the Deputies in their official capacity because Plaintiffs cannot allege or establish that the Deputies are the final decision makers or policy makers in the East Baton Rouge Sheriff's Office. (*Id.*) As such, Defendants argue that all official capacity claims against the Deputies should be dismissed. (*Id.*)

Last, as to punitive damages, Defendants argue that § 1983 does not allow for recovery of punitive damages against a governmental agency or defendants in their official capacities. (*Id.* at 19 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 246, 271 (1981); *Pemberton v. West Feliciana Parish School Bd.*, 2010 WL 431572, at *7 (M.D. La. Feb. 3, 2010)).) Therefore, Defendants argue that the claims for punitive damages against Defendants in their official capacities should be dismissed. (*Id.*)

### B. *Plaintiffs have failed to state a § 1983 claim against Defendants in their individual capacities.*

Turning to the Plaintiffs' claims against Defendants in their individual capacities, Defendants assert first, that Plaintiffs have failed to allege specific facts giving rise to a constitutional claim against the Sheriff, and second, that the Deputies are entitled to qualified immunity. (Doc. 63-1 at 19.) As to Sheriff Gautreaux, Defendants allege that there are no allegations that the Sheriff was personally involved in the incident, and therefore any § 1983 claim against the Sheriff in his individual capacity should be dismissed. (*Id.* at 20.) In the alternative, the Sheriff argues that he is entitled to qualified immunity to the extent Plaintiffs make a claim for failure to adequately train, supervise, and control, in his individual capacity.

(*Id.* at 15.) The Sheriff argues that qualified immunity applies because Plaintiffs cannot establish that the training and or supervision was objectively unreasonable in light of clearly established law when the violation occurred. (*Id.* at 15.)

Defendants assert that to determine whether the Deputies are entitled to qualified immunity, Plaintiffs at summary judgment must show a genuine fact issue regarding whether: (1) Defendants committed a constitutional violation under current law and (2) Defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the alleged misconduct. (*Id.* at 20-21.) Under the first prong, when a plaintiff brings a claim for violation of his Fourth Amendment rights for use of excessive force, a plaintiff must establish "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." (Doc. 63-1 at 21 (citing *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009)).)

As to the Deputies, Defendants argue that the Defendants are entitled to qualified immunity because the use of force was not clearly excessive to the need and/or unreasonable in light of the circumstances. (*Id.* at 23.) Defendants argue that considering the objective reasonableness of the use of force, Defendants set out that the use of deadly force in this case was reasonable because:

> Travis Stevenson was a suspect on a felony domestic violence charge. Deputies had attempted to talk to Stevenson on the telephone, but he refused and said he was not going back to jail. When Lt. Birdwell located him, Stevenson failed to comply with his lawful orders to exit the vehicle and instead started the car, put it in reverse, and slammed into Lt. Birdwell's unit in an apparent attempt to flee. Stevenson struck the Tahoe with such force that it caused the side curtain air bags to deploy and pushed the Tahoe 3.4 feet into a parked car. Det. Henning began ordering him out of the vehicle. Stevenson continued to ignore the commands and accelerated forward toward the area Lt. Birdwell was located. Det. Henning was aware of Lt. Birdwell's position and reasonably believed that Lt. Birdwell was in imminent danger of being run over and fired one shot towards Stevenson intending to stop the threat on Lt. Birdwell's life . . . Lt. Birdwell had to jump out of the way of

Stevenson's vehicle as it accelerated and violently crashed into a pole in front of a set of stairs of the apartment building. Stevenson was undeterred and reversed, smashing into Lt. Birdwell's unit again. Det. Broussard, in an attempt to disable the vehicle by using less than deadly force, fired 2-3 shots at the rear driver side tire. However, Stevenson was able to accelerate forward again, striking the pole in front of the apartment building, and reverse again, crashing into Lt. Birdwell's unit again. Stevenson revved the engine preparing to accelerate forward toward the area Lt. Birdwell and Sgt. Budd were located between the apartment building, parked SUV, and Stevenson's car. Det. Masters, Det. Broussard, Det. Montgomery, Sgt. Budd, and Lt. Birdwell all believed Lt. Birdwell was in a position to be run over by Stevenson's vehicle at that time. Det. Broussard, Det. Montgomery, and Sgt. Budd fired to stop the threat of serious injury or death.

(*Id.* at 23-24.)

Defendants also point out that Joseph J. Stine, an expert in the training, practices, and procedures utilized by law enforcement officers in the performance of their duties, found that Det. Henning's, Det. Montgomery, Det. Broussard, and Sgt. Budd action firing their duty weapons at Mr. Stevenson was in accord with the generally accepted practices and procedures for professional law enforcement officers to stop the threat of serious injury or death to Sgt. Budd or Lt. Birdwell. (*Id.* at 24.) Further, that Master Trooper Barry Ward of the Louisiana State Police concluded there was (1) no criminal misconduct on behalf of the Deputies, (2) the Deputies' actions were consistent with what a reasonably prudent officer would do in a similar circumstance, (3) the use of force was consistent with a person's right to defend another person who is in reasonably apparent danger of receiving death or great bodily harm; (4) the Deputies reasonably believed use of deadly force was the necessary intervention to protect another deputy from injury or death. (*Id.* at 24-25.)

Defendants argue that Det. Henning, Det. Montgomery, Det. Broussard, and Sgt. Budd all reasonably believed Mr. Stevenson was actively and violently resisting arrest and posed a threat of serious harm or death to Lt. Birdwell and fired their weapons to prevent serious injury or death to him. (*Id.* at 25.) Therefore, Defendants maintain Plaintiffs cannot show that Det.

11

Henning, Det. Montgomery, Det. Broussard, and Sgt. Budd violated Mr. Stevenson's

Constitutional rights by using excessive force. (*Id.*) Further, Defendants argue that because Lt.

Birdwell and Detective Masters did not fire shots or use any other force against Mr. Stevenson,

Plaintiffs cannot establish a violation of Mr. Stevenson's rights and their claims should be

dismissed. (Doc. 63-1 at 25.)

Under the second prong of the qualified immunity analysis, Defendants argue that the

Deputies "are entitled to qualified immunity because a reasonable officer would have believed

that their conduct conformed to the constitutional standard in light of the circumstances, the

clearly established law, and their training." (*Id.* at 28.) Objective reasonableness in light of

clearly established law, they maintain, is a matter of law for the Court to determine at summary

judgment. Defendants contend that although in general the right to be free from excessive force

is clearly established, under the facts of this particular case, the right to be free from the degree

of force may not have been clear to a reasonable officer at the scene. (*Id.* at 27 (citing *Bush v.

Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).) Defendants compare this case to that of *Fraire v.

City of Arlington*, in which the Fifth Circuit found that an officer was justified in firing shots,

which were eventually fatal, at Mr. Fraire who was driving his vehicle towards the officer and

did not attempt to stop or drive around him.  (*Id.* (citing, *Fraire v. City of Arlington*, 957 F.2d

1268 (5th Cir.1992)).)  The Fifth Circuit in *Fraire* emphasized that qualified immunity is

appropriate "regardless of what had transpired up until the shooting itself, [when] [the suspect's]

movements gave the officer reason to believe, at that moment, that there was a threat of physical

harm." (*Id.* at 28 (citing *Fraire*, 957 F.2d at 1276).)

Therefore, Defendants conclude that "even if Det. Henning, Det. Broussard, Det.

Montgomery, and/or Sgt. Budd violated Travis Stevenson's Fourth Amendment right by using

excessive force, they are entitled to qualified immunity because a reasonable officer would have believed that their conduct conformed to the constitutional standard in light of the circumstances, the clearly established law, and their training." (Doc. 63-1 at 28.)

Finally, as to punitive damages, Defendants maintain Plaintiffs cannot show the Deputies' actions were motivated by an evil motive or intent or that the alleged constitutional violations were due to a reckless or intentional disregard for his constitutional rights. (*Id.*) Defendants contend that the Deputies acted as a reasonably prudent officer would in similar circumstances, attempted to gain control of Mr. Stevenson without the use of deadly force, and only used force when necessary to prevent serious injury or death to Lt. Birdwell. (*Id.* at 29.)

2. Plaintiffs' response

A. *Plaintiffs can establish an excessive force claim under § 1983 against the Deputies in their individual capacities*

Plaintiffs argue that they can establish their claim under § 1983 against Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd, in their individual capacities because each of the Deputies were acting under color of law when each Deputy intentionally created a deprivation of Mr. Stevenson's constitutional rights under the Fourth Amendment. (Doc. 75 at 8.) Plaintiffs contend that, in establishing the elements of their § 1983 claim for use of excessive force, they "can satisfactorily establish that Mr. Stevenson was seized, that Mr. Stevenson suffered an injury that resulted directly and only from the use of force that was excessive to the need and the force used was objectively unreasonable." (*Id.* at 9.)

First, Plaintiffs assert that Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd seized Mr. Stevenson by physical force by shooting Mr. Stevenson and his vehicle and by boxing him in with their own vehicles. (*Id.* at 10 (citing Doc. 63-4, *Birdwell Dep.* at 16:1-24).) Plaintiffs maintain that the seizure was intentional because they "intentionally shot and stopped

Mr. Stevenson's car with bullets fired from their weapons, shouts of authority, and positioning their vehicles around Mr. Stevenson to restrain his liberty." (*Id.* (citing Doc. 63-5, *Henning Dep.* at 49:6-13; *Broussard PSI* at 21m:43s-21m:54s; Doc. 63-6, *Montgomery Dep.* at 40:13-14).) Plaintiffs argue that when he was shot and killed, Mr. Stevenson "possessed no weapon in his hand, was not trying to escape, made no threats to anyone but himself, was completely boxed-in and had communicated to the [Deputies] that he was suicidal. (*Id.* at 10 (citing Doc. 63-5, *Henning Dep.* at 40:18-21).) Further, Plaintiff contends that as Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd each shot Mr. Stevenson, each Deputy is responsible for Mr. Stevenson's seizure. (*Id.*)

Plaintiffs argue that Det. Henning fired his weapon without justification, which aggravated the situation, jeopardized Lt. Birdwell's life, and caused the other Deputies to draw their weapons upon arrival at the scene. (*Id.*) Further, Det. Broussard shot at Mr. Stevenson twice: first, when he shot three times at the tire of Mr. Stevenson's vehicle; and second, when he shot at Mr. Stevenson six times. (*Id.* at 11.) As to Det. Montgomery, he seized Mr. Stevenson when he fired six rounds at the face and body of Mr. Stevenson. (*Id.*) Finally, Sgt. Budd seized Mr. Stevenson by physical force when he fired six rounds at Mr. Stevenson's head, after pushing Lt. Birdwell out of the way. (*Id.*)

Turning to the second prong, whether Mr. Stevenson suffered an injury, Plaintiffs detail that it is undisputed that Mr. Stevenson suffered an injury when he was shot and killed by the Deputies. (*Id.* at 12.)

Finally, as to the third prong, Plaintiffs maintain that the use of deadly force was excessive to the need and objectively unreasonable. (Doc. 75 at 12.) Plaintiffs urge that under Fifth Circuit case law, the reasonableness of use of force under the Fourth Amendment is

frequently considered to be an issue for the jury under the facts and circumstances of each particular case. (*Id.* at 13 (citing *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009)).) Further, Plaintiffs contend that the totality of circumstances do not justify the Deputies use of deadly force because: (1) the Deputies had knowledge that Mr. Stevenson wished to commit suicide and was highly unstable; (2) the Deputies did not see any weapons during the incident; (3) Mr. Stevenson did not attempt to maneuver his vehicle to escape or to alter the course of the vehicle; and (4) Lt. Birdwell did not state in his deposition that he felt like his life was in danger. (*Id.* at 15.) These facts, Plaintiffs maintain, create a genuine dispute of material fact as to the reasonableness of the Deputies' use of deadly force. (*Id.* at 16.)

### B. *Punitive damages are appropriate against the Deputies in their individual capacities*

Plaintiffs state that punitive damages are appropriate because when Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd unreasonably used deadly force against Mr. Stevenson, the Deputies acted with malicious or evil intent or with reckless indifference when they ignored: (1) Mr. Stevenson's medical condition and his suicidal disposition; (2) the fact that Mr. Stevenson had no weapon; and (3) the fact that Mr. Stevenson made no meaningful attempts to escape. (Doc. 75 at 17.)

### C. *The Deputies are not entitled to qualified immunity*

Plaintiffs also maintain that Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd are not entitled to qualified immunity because their use of deadly force violated a clearly established constitutional right and was objectively unreasonable under clearly established law. (*Id.* at 18-19.) Under the first prong, Plaintiffs reference their prior arguments regarding how the use of deadly force violated Mr. Stevenson's Fourth Amendment rights. Then turning to the second prong, Plaintiffs argue that Det. Henning, Det. Broussard, Det. Montgomery, and Sgt.

Budd's actions were objectively unreasonably under clearly established law at the time of the incident because they "chose to ignore Mr. Stevenson's medical condition and his suicidal disposition, ignore the fact that Mr. Stevenson had no weapon, and ignore the fact that Mr. Stevenson made no meaningful attempts to escape" when they each shot Mr. Stevenson. (*Id.* at 19.)

### D. *Plaintiff can bring a valid § 1983 claim against the Sheriff in his official capacity based on a failure to train or supervise*

Plaintiffs argue that they can establish the § 1983 official capacity claim against the Sheriff for the failure to supervise because: (1) the training policy was inadequate; (2) the inadequate training policy was a moving force in causing the violation of Mr. Stevenson's rights; and (3) the failure to train constitutes deliberate indifference. (Doc. 75 at 20.)

Plaintiffs state that the "East Baton Rouge Sheriff's Office had no adequate training policy on dealing with mentally unstable individuals." (Doc. 75 at 20.) Plaintiffs detail that the Sheriff's Policy Manual states "all deputies when confronted with an emotionally disturbed person, will take appropriate action that will provide safety to the deputy and the community at large." (*Id.* at 22 (citing Doc. 75-4).) The Policy Manual also details that suicide attempts are an indication of a mental illness. (*Id.*) Plaintiffs point to the expert witness testimony of Lloyd Grafton, which states that the "Memphis Model", as followed by the International Association of Chiefs of Policy, is the proper policy on dealing with mentally unstable individuals. (*Id.* at 21 (citing Doc. 75-3).) Therefore, Plaintiffs contend that because the East Baton Rouge Sheriff's Office does not follow the "Memphis Model," it is inadequate. (*Id.*)

Plaintiffs also argue that the inadequate training was a "moving force" to cause the violation of Mr. Stevenson's rights because the Deputies did not follow the Memphis Model's steps to approach a mentally unstable individual. (*Id.*) Further, Plaintiffs again point the Court to

Mr. Grafton's expert testimony that the Deputies did not follow the Memphis Model's guidelines in this case. (*Id.* (citing Doc. 75-3 at 16).) Mr. Grafton states, "The situation was not properly handled from the beginning, which led to a steadily escalating situation, resulting in force that was clearly excessive, resulting in pain and death to Mr. Stevenson." (Doc. 75 at 22 (citing Doc. 75-3 at 19).) Therefore, Plaintiffs conclude that because the Deputies were ill trained in proper procedures and methods of dealing with mentally unstable individuals, their training was a moving force in causing the violation of Mr. Stevenson's rights. (*Id.*)

Last, Plaintiffs argue that the failure to train the Deputies on methods of dealing with mentally unstable individuals constitutes deliberate indifference on the part of the Sheriff, based on the proof of this single incident. (*Id.* at 23.) Plaintiffs acknowledge that proof of deliberate indifference normally requires a plaintiff to show a pattern of similar violations. Plaintiffs, however, maintain that in this case, the application of the "single incident exception" is appropriate because the excessive use of force was the highly predictable consequence of the failure to train the Deputies in how to deal with a mentally unstable individual. Specifically, Plaintiffs assert:

> the entire police department was informed that there was a mentally unstable individual involved. The East Baton Rouge Sheriff's Office discussed the mental health of the patient on the radio and knew that they were sending the Defendant Shooters and ill trained officers to handle a situation that they were not trained to handle properly. (See *Budd PSI Interview* at 10m:50s-11m:10s)( See Exhibit 3). It was highly predictable that the [Deputies] would not be trained to handle the situation. The East Baton Rouge Sheriff's Department had notice that Mr. Stevenson was attempting to kill himself. (*Id.*) Mr. Stevenson spoke with the East Baton Rouge Sheriff's Department and told them that he was going to kill himself. (*Id.*) [The Deputies] also had knowledge that Mr. Stevenson wished to commit suicide. (*Id.*) [Sgt.] Budd spoke directly with Mr. Stevenson five (5) times on the phone shortly before the incident and spoke at length about his suicidal disposition. (*Id.*) In addition, [Det.] Henning, Broussard, and Montgomery were notified by radio along with the rest of the East Baton Rouge Police Department. (*Id.*) Mr. Stevenson revealed to all parties involved that he needed to seek medical attention. Each of the [Deputies] and the East Baton Rouge Sheriff's Department were on

notice that Mr. Stevenson wished to commit suicide and was highly unstable. Therefore, it was a highly predictable consequence to East Baton Rouge Sheriff's Office that sending these particular officers into this particular situation would be a constitutional violation.

(*Id.* at 23-24.) As such, Plaintiffs conclude that the Sheriff's failure to train constitutes deliberate indifference. (*Id.*)

### E.  *The Sheriff is not entitled to qualified immunity in his official capacity*

Plaintiffs state that the Sheriff is not entitled to qualified immunity because he is being sued in his official capacity. (Doc. 75 at 24-25 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 556 n. 10, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).)

### 3.  Defendants' reply

### A.  *Plaintiffs have failed to state a § 1983 claim against Defendants in their official capacities.*

Defendants state Plaintiffs failed to respond to Defendants' arguments for dismissal of the § 1983 official capacity claim against Lt. Birdwell, Det. Broussard, Det. Montgomery, Det. Henning, Det. Masters, and Sgt. Budd. (Doc. 82 at 6.) Defendants also assert that Plaintiffs do not address Defendants arguments regarding the dismissal of the § 1983 claims against the Sheriff for a failure to adequately punish, properly investigate, and discipline. (*Id.* at 13.) As such, Defendants maintain that as a matter of law, Plaintiffs have waived any opposition to these arguments. (*Id.* at 7 (citing *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) ("The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal. By analogy, failure to brief an argument in the district court waives that argument in that court.") (citing *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10 (S.D. Tex. 2003)).)

As to the official capacity claim against the Sheriff for a failure to train, Defendants argue that "Plaintiffs assert for the first time in the Memorandum in Opposition to Motion for

Summary Judgment that the East Baton Rouge Sheriff's Office's training policy on dealing with mentally unstable individuals was inadequate." (Doc. 82 at 7.) Defendants maintain that the *Complaint* and the *Supplemental and Amended Complaint* do not allege that the training policy regarding mentally unstable individuals is inadequate but instead allege that "the Sheriff failed to train in the proper and graduated use of force." (*Id.*) Because Plaintiffs only raised this new claim in response to summary judgment, Defendants contend it is not properly before the Court and should be disregarded. (*Id.* (quoting *Cutrera Bd. of Sup'rs of Louisiana State University,* 429 F. 3d 108,113 (5th Cir. 2005) ("[A] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.")).)

On the merits of the adequacy of the training procedures on mentally unstable individuals, Defendants dispute Plaintiffs' claims. Defendants argue that there is no support for the argument that the Sherriff had no adequate policy on dealing with mentally unstable individuals. (*Id.* at 9.) First, Defendants highlight that the deposition testimony that Plaintiffs cite in support of their argument that the Deputies did not follow any special training procedures on dealing with mentally unstable individual, does not support that claim. (*Id.* at 8.) The cited deposition testimony of Lt. Birdwell states:

> Q: Just drawing on your law enforcement experience and your training, do you approach if you know in advance that a suspect who you are arresting or in the process of arresting has mental issues, suicidal ideations, do you approach that suspect differently with regard to how you handle them?
>
> A: Yes, you approach it because you have the knowledge that he is going to hurt himself, so I mean you approach it with that knowledge.
>
> Q: And based upon that knowledge, is there any difference in how you approach a suspect like that generally?
>
> A: No.

Q: So with regard to the process of arrest with regard to the interaction that you have with a suspect who is mentally imbalance, suicidal, you approach that suspect the same way that you would approach –

A: You have a heightened sense of caution.

(*Id.* at 8 (citing Doc. 63-4, *Birdwell Dep.* 9:21-10:15).) Defendants maintain that Lt. Birdwell did not testify that he did not have training on dealing with mentally unstable individuals. (*Id.*)

Second, Defendants assert that the Deputies were POST certified, which means that, at a minimum, they had the training required by the State of Louisiana. (*Id.* at 9.) Mr. Grafton, Defendants maintain, did not review the POST training plans, review the East Baton Rouge Sheriff's training materials or address the training procedures. (*Id.*) As to the lack of evidence regarding the Deputies' training on dealing with mentally unstable individuals, Defendants contend that because it was not alleged in the Complaint, it was not submitted in support of the *Motion*. (*Id.*) Third, Defendants dispute that they had notice that Mr. Stevenson was a mentally unstable individual because they did not have information on his medical or mental health history and were only informed that Mr. Stevenson had threatened to jump off of the Mississippi River Bridge. (*Id.*) Mr. Stevenson's car was located over a mile from the river and the bridge. (*Id.*) Fourth, Defendants argue that because Mr. Stevenson was a suspect in a violent felony, the first step of the IACP Model (that Plaintiffs argue was ignored and led to the escalation of use of force) did not apply. Further, the evidence shows that Lt. Birdwell did not approach in a threatening manner. (Doc. 82 at 10.)

Defendants maintain that Plaintiffs have not shown that the single incident exception applies in this case. (*Id.* at 10-11.) Defendants reiterate that "a showing 'of deliberate indifference is difficult, although not impossible, to base on a single incident.'" (Doc. 82 at 11 (citing *Valle v. City of Houston,* 613 F.3d 536, 549 (5th Cir. 2010)).) Defendants argue that there is no evidence the Sheriff had notice that a shooting such as this was a highly predictable

consequence of the training being provided.  (*Id.* at 13.) Without such evidence, Plaintiffs cannot invoke the single incident exception and cannot prove deliberate indifference. Therefore, Defendants maintain the § 1983 claim against the Sheriff in his official capacity should be dismissed. (*Id.*)

        B.   *Plaintiffs have failed to state a § 1983 claim against Defendants in their individual capacities.*

First, as to the Sheriff, Defendants contend that Plaintiffs concede he is being sued in his official capacity and argue that to the extent an individual capacity claim is asserted, it should be dismissed. (*Id.*) Second, as to Lt. Birdwell and Det. Masters, Plaintiffs did not address Defendants' arguments for dismissal of the § 1983 claims in their individual capacities, and thus Defendants maintain they have waived such opposition as a matter of law. (Doc. 82 at 19.)

Next as to the individual capacity claims against Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd, Defendants argue that Plaintiffs cannot establish that the force used against Mr. Stevenson was objectively unreasonable in light of the circumstances. (*Id.* at 14.) Defendants maintain that the Deputies reasonably believed Mr. Stevenson posed a threat of death or serious harm when he accelerated his vehicle towards Lt. Birdwell. (*Id.*)

Refuting Plaintiffs' arguments that the conduct was objectively unreasonable, Defendants assert that they had no information about Mr. Stevenson's medical condition, they were only aware that he had threatened to jump off the Mississippi River Bridge. (*Id.*) Defendants also maintain that Mr. Stevenson had room to leave the area where he had parked, and instead used his vehicle as a weapon. (*Id.*) There is no evidence that Mr. Stevenson did not intend to aim his car at the officers on the scene, given that he accelerated his vehicle at a high rate of speed in Lt. Birdwell's direction. (Doc. 82 at 15.)

Further, Defendants maintain that there are no issues of fact in this case. (*Id.*) Defendants assert that the evidence cited by Plaintiffs to support their argument actually contradicts their argument that there is a genuine issue of material fact as to whether Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd reasonably believed Mr. Stevenson posed a significant threat to Lt. Birdwell. (*Id.*) The Plaintiffs cited Lt. Birdwell's deposition testimony for the proposition that he did not feel he was in danger, Lt. Birdwell's deposition testimony states:

> Q: Did you ever feel – and I read that statement you gave to the Louisiana State Police – did you ever feel that you were, based upon the actions that you took to get out of the way and all of his, did you ever feel that he was a physical threat to you?
>
> A: I think it all happened so fast, I don't think any cop thinks that they are ever in danger. I mean we go out and we do our job and we take the bad guy into custody. But you put yourself in danger all the time

(*Id.* at 15 (citing Doc. 63-4 at 37:11-21).) Defendants also point out that Lt. Birdwell also testified he felt physically threatened by Mr. Stevenson "throughout the whole situation" and that he felt he was in a position to be run over by the vehicle. (*Id.* at 15-16.)

Ultimately, Defendants argue that the use of force was objectively reasonable under the circumstance because:

> the [D]eputies were dressed in clothing identifying themselves as law enforcement officers, verbally identified themselves as law enforcement officers, and ordered Mr. Stevenson to stop his vehicle and exit. After Mr. Stevenson's initial reverse in which he slammed into Lt. Birdwell's unit, Lt. Birdwell tried to approach Mr. Stevenson's vehicle and extract him, but Mr. Stevenson accelerated towards Lt. Birdwell who was then positioned in front of Mr. Stevenson's car. Det. Henning, believing Mr. Stevenson was trying to run over Lt. Birdwell and Lt. Birdwell was in a position to be injured or killed, discharged his firearm at Mr. Stevenson. Fortunately, Lt. Birdwell was able to jump out of the way of Mr. Stevenson's accelerating vehicle and into a parked SUV behind him. Lt. Birdwell optimistically believed Mr. Stevenson would comply and stop, and therefore, he continued to try to approach Mr. Stevenson's vehicle to extract him, though he never made it to his vehicle again. When Sgt. Budd arrived, he initially thought the car was immobilized and went to assist Lt. Birdwell in removing him from the car, but Mr. Stevenson reversed again. Sgt. Budd and Lt. Birdwell were then positioned in front of Mr. Stevenson's vehicle when he shifted into drive. Det. Montgomery, Det. Broussard,

and Sgt. Budd fired their service weapons to stop Mr. Stevenson's threat of death or serious bodily injury to Lt. Birdwell. Given Lt. Birdwell's "close proximity" to the vehicle and the "extremely brief period of time" in which he had to react to the vehicle's abrupt change of direction and movement towards him, the [D]eputies were objectively reasonable in their perception of a threat of serious physical harm to Lt. Birdwell and in their decision to respond to that threat with deadly force.

(Doc. 82 at 18-19.)

Finally, as to punitive damages, Defendants argue that the Deputies acted as a reasonably prudent officer would in similar circumstances, not with malicious or evil intent or reckless indifference. Therefore, Defendants maintain punitive damages are not appropriate and any claim for punitive damages against Defendants in their individual capacities should be dismissed. (*Id.* at 19.)

   *b.*  *Analysis*

   1.  <u>Personal capacity claim under § 1983.</u>

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' ... [which] is effectively lost if a case is erroneously permitted to go to trial." *Khansari v. City of Houston*, 14 F. Supp. 3d 842, 853 (S.D. Tex. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009)). "The doctrine of qualified immunity was created to balance the interest of compensating persons whose federally protected rights have been violated against the fear that personal liability might inhibit

public officials in the discharge of their duties." *Id.* (citing *Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994)).

The qualified immunity defense is a familiar one, with two prongs to the test. *Huff v. Crites*, 473 F. App'x. 398 (5th Cir. 2012). As first enunciated in *Saucier v. Katz*, 533 U.S. 194 (2001), the first step in the analysis is to consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Second, the district court looks to "whether the rights allegedly violated were clearly established." *Id.* This inquiry, the Supreme Court stated, is "undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202. Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *See Pearson*, 555 U.S. at 236.

The Supreme Court recently explained in *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-1153 (2018):

> "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly,* 580 U.S. ——, ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (*per curiam*) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*).
>
> Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 580 U.S., at ——, 137 S.Ct., at 551 (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ibid.* . . .

> "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White,* 580 U.S., at ——, 137 S.Ct., at 552 (internal quotation marks omitted). . . . An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 572 U.S. ——, ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152-1153 (2018).

### A.  *Whether Mr. Stevenson's Fourth Amendment Rights were violated by use of excessive force.*

"[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Bazan v. Hidalgo County*, 246 F.3d 481, 487 (5th Cir. 2001) (emphasis and citation omitted). The Fifth Circuit has recognized:

> It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.

*Id.* (citations omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citation omitted).

"Whether the amount of force used is clearly 'excessive' and 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) (citing *Deville*, 567 F.3d at 167). "Factors to consider include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville*, 567 F.3d at 167 (citation and quotations omitted). Further, the Supreme Court has cautioned, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

25

officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S.

386, 396 (1989). The Supreme Court has further instructed:

> As in other Fourth Amendment contexts ... the "reasonableness" inquiry in an
> excessive force case is an objective one: the question is whether the officers' actions
> are "objectively reasonable" in light of the facts and circumstances confronting
> them, without regard to their underlying intent or motivation. An officer's evil
> intentions will not make a Fourth Amendment violation out of an objectively
> reasonable use of force; nor will an officer's good intentions make an objectively
> unreasonable use of force constitutional.

*Id.* at 397 (citations omitted).

There is not a genuine dispute that Mr. Stevenson suffered an injury when he was shot

which resulted directly from and only from the gunshots fired by the Deputies. Therefore, the

Court must determine if the force used was clearly excessive to the need and the conduct was

objectively unreasonable.

Defendants argue that the use of force by Det. Henning, Det. Broussard, Det.

Montgomery, and Sgt. Budd was not clearly excessive to the need and their conduct was

objectively reasonable in light of the facts and circumstances confronting them. (Doc. 63-1 at

21.) Plaintiffs argue that there are genuine issues of material fact as to whether deadly force was

clearly excessive and objectively reasonable because: (1) the Deputies had knowledge that Mr.

Stevenson wished to commit suicide and was highly unstable; (2) the Deputies did not see any

weapons during the incident; (3) Mr. Stevenson did not attempt to maneuver his vehicle to

escape or to alter the course of the vehicle; and (4) Lt. Birdwell did not state in his deposition

that he felt like his life was in danger. (Doc. 75 at 15.)

Plaintiffs analogize this case to that of *Edmond v. City of New Orleans*, No. 93-3602,

1994 U.S. App. LEXIS 42156 (5th Cir. Apr. 7, 1994), in which the Fifth Circuit considered

whether there were genuine issues of material fact precluding summary judgment on an

excessive force claim. In *Edmond*, plainclothes officers who did not identify themselves

approached a car driven by the plaintiffs with their guns drawn. *Id.* at *2. The plaintiffs believed

they would be robbed and attempted to drive away. *Id.* Without identifying themselves, the

officers fired a weapon through the window. *Id.* The plaintiffs tried to maneuver away, and one

officer was struck by the car. *Id.* The officers continued to shoot to stop the car. *Id.* The plaintiffs

were injured in the shooting. *Id.*

The Fifth Circuit determined that there was a genuine dispute of material fact regarding

whether the force was excessive, explaining:

> The officers justify the use of force against Edmond and Oden because Oden drove
> directly at Poole at a high rate of speed, in what appeared to be an intentional
> manner. The plaintiffs contest whether Oden drove at Poole. The plaintiffs also
> argue that they would not have tried to get away if the police officers had identified
> themselves. Resolving whether the police had a need to use force, and whether they
> used force in an objectively reasonable way, requires resolving disputed testimony
> about what happened when the police stopped the plaintiffs' car.

*Id.* at *4. The Fifth Circuit also distinguished this case from *Fraire v. City of Arlington* and *Reese*

*v. Anderson*, explaining that in those cases:

> [T]he police officers announced who they were before using force. Further, there
> was no real dispute in those cases about the danger the plaintiffs posed to the police.
> In *Fraire,* for example, there was no dispute that the plaintiff drove his pickup truck
> straight at a police officer in attempt to hit him. In this case, it is unclear whether
> Oden was aiming his car at Poole when he tried to get around the unmarked police
> car, and it is unclear whether Oden even hit Poole.

*Id.*

The facts and circumstances in this case are distinguishable from *Edmond* because the

Deputies were all wearing clothing that identified them as law enforcement officers and

identified themselves as law enforcement when approaching Mr. Stevenson. This case is more

analogous to *Fraire v. City of Arlington*, in which the Fifth Circuit explained:

> [The officer's] actions cannot be said to be grossly disproportionate to his self
> defense need under the circumstances. The eye-witness accounts confirm that [the
> officer] was in mortal danger of being run over by [the plaintiff's] pickup, and that
> [the officer] waited to fire until the last second when the truck was dangerously

> close. In fact, had the truck not veered to the left when [the plaintiff] was shot, [the officer] might still have been severely injured or killed. We cannot say that a reasonable police officer in [the officer's] place would have understood his actions to be unlawful.

*Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992). Importantly and unlike Plaintiffs arguments that Mr. Stevenson was unarmed, *Fraire* recognizes that a vehicle can be used a weapon to severely injure or kill another. *Id.* at 1276.

Plaintiffs likewise argue that the Deputies knew Mr. Stevenson was mentally unstable and threatened suicide and therefore should have acted with more caution when approaching Mr. Stevenson. Plaintiffs seem to suggest that the Deputies created or exacerbated the situation leading to the use of force. As the Fifth Circuit in a recent opinion, *Malbrough v. Stelly*, explained, "[i]n the Fifth Circuit, the excessive force inquiry zeros in on whether officers or others were "in danger *at the moment of the threat* that resulted in the officer's use of deadly force." *Malbrough v. Stelly*, No. 19-30269, 2020 WL 2507355, at *4 (5th Cir. May 14, 2020) (quoting *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (emphasis in original)). As such, the Fifth Circuit has

> rejected the idea that a police officer uses excessive force simply because he has "manufactured the circumstances that gave rise to the fatal shooting." *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992); *Hover v. Brenner*, No. 99-60462, 2000 WL 1239118, at *1 (5th Cir. Aug. 7, 2000) (per curiam) (noting that, "[i]n this circuit, § 1983 liability cannot be premised on the fact that an officer 'creates the need' to use excessive force by failing to follow police procedure").

*Id.* Therefore, the proper inquiry for the Court in examining whether there are genuine disputes of material facts regarding whether the use of force was excessive and unreasonable is on the moments that the officers used force, not the situation leading up to the use of force.

The Fifth Circuit's inquiry in *Malbrough* is instructive. In *Malbrough*, law enforcement officers attempted to arrest Campbell, who was driving a car. *Id.* at *2. The officers parked their

unit behind Campbell's car to prevent him from fleeing. *Id.* Campbell reversed and crashed into the patrol unit before accelerating forward and veering left into the proximity of Ware, one of the officers. *Id.* The other officers at the scene shot Campbell, after perceiving that he had struck Ware with the car. *Id.* After the event, it was revealed that Ware was uninjured, and it was disputed whether Ware was struck or had slipped and fell. *Id.*

Determining that the use of force was not objectively unreasonable, the Fifth Circuit explained:

> In analyzing the reasonableness of the officers' actions, we are guided by *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007). In *Hathaway*, an officer on foot fired his weapon at a car that accelerated toward him. The bullet struck and killed the driver. We emphasized two factors in determining that the officer's use of deadly force was reasonable: (1) the limited time the officer had to respond, and (2) the officer's proximity to the path of the vehicle. *Id.* at 322. We further highlighted "our circuit's general acknowledgment that police officers are often required to make instantaneous decisions that ought not be second-guessed merely because other options appear plausible in hindsight." *Id.* at 321.

> Here, we must be mindful of "proximity and temporal factors." *Id.* Malbrough asserts that Ware's location, and whether Ware was ever in a position of danger, are of critical importance in our reasonableness inquiry. That's almost right. Ware's location matters, but it's not relevant whether, in hindsight, he was ever in real danger. We must ask whether it would have *appeared* to a reasonable officer on the scene that Ware, other officers, or bystanders were in danger.

> Malbrough questions Ware's location by attempting to point out discrepancies in Ware's testimony with testimony of other officers . . . Malbrough's alleged discrepancies don't reveal a dispute of material fact: No one contends that Ware was in the house or otherwise far from the Yukon *at the moment* Campbell took the hard-left turn, attempting to flee the scene. Wherever Ware was when Campbell backed into the patrol unit—and however long it took him to get in proximity to the Yukon—the fact that he *was in proximity* is beyond dispute.

> Malbrough needs to show that Ware (as well as the other officers and bystanders) were far enough away from the Yukon and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger. Like the district court, we have no trouble believing Ware was able to reach the Yukon quickly from inside the house. But Malbrough's evidence, at best, would simply indicate that Ware was mistaken about his location when he heard the Yukon smash into the patrol unit. And his location at that precise moment is completely irrelevant.

29

Next, Malbrough insists that, contrary to the officers' story, Ware was never struck by the Yukon. He merely fell. But even assuming that Ware wasn't struck but rather fell by the bushes, the record is clear that: (1) Ware went to the ground near the Yukon; (2) it was announced that an officer was down; and (3) the firing did not take place until the officers saw Ware go to the ground near the fleeing vehicle. As the district court aptly put it, "[o]nce it was announced that an officer was down, it was objectively reasonable for the officers to respond with force in light of the circumstances." *Malbrough v. City of Rayne*, No. 10-107-SDD-CBW, 2019 WL 1120064, at \*9 (W.D. La. March 11, 2019). The precise location of Ware vis-à-vis the Yukon, and whether he was struck by the vehicle, is in dispute. But what's not in dispute is that the officers thought Ware was in danger.

. . .

It is tragic that Campbell was so severely injured. But we are obligated, in circumstances such as these—"tense, uncertain, and rapidly evolving"—to give allowance "for the fact that police officers are often forced to make split-second judgments" about the amount of force needed to confront a dangerous situation. *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. We cannot allow the "theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)). Because the officers here reasonably believed that Campbell posed an immediate threat to officers and others, the officers did not use excessive force in violation of the Fourth Amendment.

*Id.* at \*5-7.

Similarly, in this case, the Court must consider (1) the limited time Det. Henning, Det. Broussard, Det. Montgomery and Sgt. Masters had to respond, and (2) the Lt. Birdwell's proximity to Mr. Stevenson's vehicle. Plaintiffs in this case argue that Lt. Birdwell could have jumped out of the way of Mr. Stevenson's vehicle because there is no evidence that Mr. Stevenson was turning the wheel or otherwise aiming for Lt. Birdwell. Defendants dispute that there was room for Lt. Birdwell to jump out of the way.

Taking all facts in favor of the Plaintiffs, what is undisputed, like in *Malbrough*, is that the other officers witnessing the scene, Det. Henning, Det. Broussard, Det. Montgomery, and Sgt Budd all believed that Lt. Birdwell was in danger of being struck by Mr. Stevenson's vehicle. When Mr. Stevenson first accelerated forward towards Lt. Birdwell, Det. Henning perceived Lt.

Birdwell would be struck. Although Det. Hennings fired his gun, he did not hit Mr. Stevenson and Lt. Birdwell was able to jump away from the vehicle. But as the encounter progressed, and once Det. Broussard, Det. Montgomery and Sgt. Budd arrived at the scene, each of the officers independently concluded that Lt. Birdwell was in danger of being struck by Mr. Stevenson's car given the trajectory Mr. Stevenson was taking and Lt. Birdwell's position.

As in *Malbrough*, Mr. Stevenson's death is a tragedy. But as in *Malbrough*, the Court concludes that no reasonable jury could conclude that the Deputies did not reasonably believe that Mr. Stevenson posed an immediate threat to Lt. Birdwell. Further, the Court concludes that Plaintiffs have not shown that a genuine dispute of material fact exists regarding whether a reasonable officer could have thought Lt. Birdwell was not in danger. Therefore, the Court concludes that Det. Henning, Det. Broussard, Det. Montgomery, and Sgt. Budd are entitled to qualified immunity on the claim of excessive force in violation of the Fourth Amendment.

### B. *Plaintiffs' personal capacity claims against the Sheriff, Lt. Birdwell, and Det. Masters.*

Defendants argue that there are no allegations that the Sheriff was personally involved in the incident, and therefore any § 1983 claim against the Sheriff in his individual capacity should be dismissed. Plaintiffs respond that the Sheriff is being sued in his official capacity. Therefore, the Court concludes that to the extent an individual capacity claim is asserted against the Sheriff, it should be dismissed.

Second, as to Lt. Birdwell and Det. Masters, Plaintiffs did not address Defendants' arguments that the claims should be dismissed because Plaintiffs cannot establish that either Lt. Birdwell or Det. Masters fired any shots or used force against Mr. Stevenson.  As this Court noted in *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018),

> "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *Magee v. Life*

31

*Ins. Co. of N. Am.*, 261 F.Supp.2d 738, 748 n. 10 (S.D. Tex. 2003) (citations omitted); *see also United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation ... is a failure to brief and constitutes waiver"). "By analogy, failure to brief an argument in the district court waives that argument in that court." *Magee*, 261 F.Supp.2d at 748 n. 10; *see also Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." (citations omitted) ); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

Further, the undisputed material facts show that neither Lt. Birdwell nor Det. Masters fired at or otherwise used force on Mr. Stevenson. Therefore, the Court concludes dismissal of the individual capacity claims against Lt. Birdwell and Det. Masters is appropriate.

2. Official capacity claims under § 1983

    A. *Official capacity claim against the Sheriff for failure to train.*

Plaintiffs also bring § 1983 claims against Defendants in their official capacity. "An official capacity suit is the equivalent of a suit against the entity of which the officer is an agent. To determine whether a public official is liable in his official capacity, the Court looks to the jurisprudence discussing whether a municipality or local government entity is liable under section 1983." *Romain v. Governor's Office of Homeland Sec.*, No. 14-660, 2016 WL 3982329, at *6 (M.D. La. July 22, 2016) (citations and quotations omitted).

"Section 1983 offers no *respondeat superior* liability." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury....'" *Id.* (quoting *Monell v. Dept. of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694, (1978) ).

That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.'" *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691, 98 S. Ct. 2018). Plaintiffs must allege "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (quoting *Piotrowski*, 237 F.3d at 578).

"A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984), *on reh'g*, 739 F.2d 993 (5th Cir. 1984). "Official policy is:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined."

*Id.*

With respect to practices and customs: "A pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski*,

237 F.3d at 579). "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Id.* (quoting *Webster*, 735 F.2d at 842). "It is thus clear that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case.'" *Id.* at 850–51 (quoting *Piotrowski*, 237 F.3d at 582 (citations omitted)). "A pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question.'" *Id.* at 851 (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).

"A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). Thus, in *Pineda*, the Fifth Circuit held that eleven instances of warrantless entry did not support a pattern of unconstitutional warrantless entry. *Pineda*, 291 F.3d at 329. In *Peterson*, the Fifth Circuit found that 27 complaints of excessive force between 2002 and 2005 were insufficient to constitute a pattern, as almost all of the incidents involved small crimes with minor injuries, and the police force was large. *Peterson*, 588 F.3d at 851.

As to the policymaker, "state law determines whether a particular individual is a county or municipality final decision maker with respect to a certain sphere of activity." *Causey v. Par. of Tangipahoa*, 167 F. Supp. 2d 898, 907 (E.D. La. 2001) (quoting *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) ); *see also Valle*, 613 F.3d at 542 (citing *Pembaur*, 475 U.S. at 482, 106 S. Ct. 1292) ("Whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law."). "Under Louisiana law, it is clear that 'the Sheriff in his official capacity is the appropriate governmental entity responsible for any

constitutional violations committed by his office.'" *Causey*, 167 F. Supp. 2d at 907 (citing *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d 606, 614 (E.D. La. 1998) (citations omitted)). "Indeed, 'the sheriff in his official capacity is the appropriate governmental entity on which to place responsibility for the torts of a deputy sheriff.'" *Id.* (citing *Burge v. Parish of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999); *Thomas v. Frederick*, 766 F. Supp. 540 (W.D. La. 1991) (citations omitted); *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So.2d 669 (La. 1981)).

Plaintiff also has the "burden of demonstrating actual or constructive knowledge of the policy-making official for the municipality[.]" *Pineda*, 291 F.3d at 330. "Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information." *Id.* (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)). "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Id.* (quoting *Bennett*, 728 F.2d at 768).

"The third prong requires a plaintiff to prove 'moving force' causation." *Valle*, 613 F.3d at 542. "To succeed, 'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.* (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). "That is, 'the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'" *Id.* (quoting *Brown*, 520 U.S. at 411). "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.' " *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

Additionally, "[p]laintiffs must meet a heightened standard of causation in order to hold a municipality liable under § 1983." *Valle*, 613 F.3d at 546 (citing *City of Canton*, 489 U.S. at 391–92). Plaintiff must show that the municipal policy was the "'moving force' that caused the specific constitutional violation." *Id.* (citing *Bryan County*, 219 F.3d at 461). "In other words, the plaintiff must establish a 'direct causal link' between the municipal policy and the constitutional injury." *Id.* (citing *Brown*, 520 U.S. at 404).

In this case, Plaintiffs bring a claim against the Sheriff for failure to train. Therefore, Plaintiffs "must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle*, 613 F.3d at 544 (citation omitted). "All failure to act claims, such as ... failure to train [or] supervise ... involve the same basic elements: inadequacy, deliberate indifference, and causation." *Snow v. City of El Paso*, 501 F. Supp. 2d 826, 833 n. 5 (W.D. Tex. 2006) (citations omitted).

"The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Valle*, 613 F.3d at 544 (quoting *Bryan County*, 219 F.3d at 457). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* (quoting *City of Canton*, 489 U.S. at 390, 109 S. Ct. 1197).

Concerning the causation requirement, the Fifth Circuit "require[s] that the municipality's failure to train be the 'moving force' that caused the specific constitutional violation." *Valle*, 613 F.3d at 546 (citing *Bryan County*, 219 F.3d at 461). "In other words, the plaintiff must establish a 'direct causal link' between the municipal policy and the constitutional injury." *Id.* (quoting *Brown*, 520 U.S. at 404, 117 S. Ct. 1382). The Fifth Circuit has "said that the connection must be

more than a mere 'but for' coupling between cause and effect. The deficiency in training must be the actual cause of the constitutional violation." *Id.*

"[D]eliberate indifference is a stringent standard of fault, requiring [allegations] that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Plaintiff "must show that 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.' " *Valle*, 613 F.3d at 547 (quoting *City of Canton*, 489 U.S. at 390). In *Connick*, the Supreme Court summarized this standard as follows:

> Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities[.] ... *see also Pembaur, supra*, at 483, 106 S. Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").
>
> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"— necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 563 U.S. at 61–62 (citations and quotations mostly omitted).

"Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy." *Fraire*, 957 F.2d at 1278 (5th Cir. 1992) (citing *Bennett v. City of*

*Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir.1984), *cert. denied*, 472 U.S. 1016 (1985)); *see Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (to satisfy deliberate indifference element of failure-to-train claim, a plaintiff must usually demonstrate a "pattern of violations" and that inadequate training is "obvious and obviously likely to result in a constitutional violation"). However, a showing "of deliberate indifference is difficult, although not impossible, to base on a single incident." *Valle*, 613 F.3d at 549 (citation omitted). "The 'single incident exception' is extremely narrow; a plaintiff must prove that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (emphasis by *Valle*, citations and quotations omitted). Even so, the single incident exception "is a narrow one, and one that [the Fifth Circuit has] been reluctant to expand." *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003). Similarly, "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Porter*, 659 F.3d at 446 (quoting *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. 51, 61 (2011) (citation omitted). The Supreme Court advises that the heightened standard of fault and causation for these claims is intended to prevent federal courts from engaging "in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." *City of Canton*, 389 U.S. at 392 (internal citations omitted).

In this case, Plaintiffs allege in the Amended Complaint that the Sheriff "has failed to adequately train his deputies regarding the proper response to situations such as described herein. This failure included a failure to train police officers in the proper and graduated use of force." (Doc. 38 at ¶ 31.) Further, Plaintiffs allege that as a matter of policy and practice the Sheriff facilitates misconduct by

> failing to adequately punish and discipline prior instances of similar misconduct, thereby leading subordinate deputies, including the Defendant deputies named herein, to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting [Mr. Stevenson]. Specifically, East Baton Rouge Parish Sheriff Deputies accused of excessive force and/or violations of civil rights can be confident that they will not be investigated in earnest, discipline will not be recommended if required, to enforce discipline even where the deputy has engaged in excessive force or otherwise violated the civil rights of citizens.

(*Id.* at ¶ 29.)

However, in their response to Defendants' *Motion*, Plaintiffs argue that the Sheriff "had no adequate training policy on dealing with mentally unstable individuals." (Doc. 75 at 20.) As Defendants point out, the Amended Complaint does not allege an official capacity claim based on a failure to train on dealing with mentally unstable individuals. As the Fifth Circuit has stated, "It is well-established that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Putty v. Fed. Nat'l Mortg. Ass'n*, 736 F. App'x 484 (5th Cir. 2018) (citing *Cutera v. Bd. Of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)); *see Amedee v. Shell Chem. LP-Geismer Plant*, 384 F. Supp. 3d 613, 638 (M.D. La. 2019), *aff'd sub nom. Amedee v. Shell Chem., L.P.*, 953 F.3d 831 (5th Cir. 2020) ("The law is well-settled that a plaintiff may not rely on new claims raised for the first time in response to a motion for summary judgment. The Court will not consider any facts, offered exhibits, or argument related to Plaintiff's . . . claim that is raised for the first time in her opposition to Defendant's motion for summary judgment.").

Even if the Court were to consider Plaintiffs arguments regarding a failure to train deputies on dealing with a mentally unstable individual, the Court remains persuaded that the undisputed material facts do not show the Sheriff was deliberately indifferent. Plaintiffs do not allege, and the undisputed facts do not show, a pattern of similar incidents. Instead Plaintiffs argue that the single incident exception applies because the *highly predictable consequence* of a failure to train on how to deal with a mentally unstable individual would result in Mr. Stevenson's injury and that the failure to train represented the moving force behind the constitutional violation.

This Court has previously explained the narrow single incident exception from *Brown* as thus:

> In *Brown*, the Fifth Circuit found the single incident exception to apply when there was an utter failure to train and supervise. *Brown v. Bryan County, Okla.*, 219 F.3d 450, 462 (5th Cir. 2000). The Fifth Circuit later stated in *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273 (5th Cir. 2002), that the single incident exception applied in *Brown* because the county in that case "failed to provide any training or supervision for a young, inexperienced officer with a record of recklessness." *Cozzo*, 279 F.3d at 288 (internal quotation marks and citations omitted). The court also noted that "there is a difference between a complete failure to train as in *[Brown]* and a failure to train in one limited area."

*Bibbins v. City of Baton Rouge*, 489 F. Supp. 2d 562, 584 (M.D. La. 2007) (emphasis omitted).

In this case, the undisputed material facts show that each of the Deputies were POST certified and had the minimum certification required by the State of Louisiana. (Doc. 63-7; Doc. 63-8; Doc. 63-9.) The East Baton Rouge Sheriff's Office also has a mental illness policy that states:

> The purpose of this order is to set forth policies and procedures regarding the interaction of Sheriff Office personnel with persons suspected of suffering from mental illness or substance abuse. It is the policy of the Sheriff's Office that all deputies, when confronted with an emotionally disturbed person, will take appropriate action that will provide safety to the deputy and the community at large.

(Doc. 75-4 at 1.) Further, the East Baton Rouge Sheriff's Office mental illness policy indicates that "Each deputy will receive instructions regarding interaction with persons suffering from mental illness as part of their basic training. In-service training will cover this topic at least once every three years." (*Id.* at 3.) Plaintiff did not produce evidence at summary judgment that the Deputies did not receive this basic training. Further, Plaintiffs' expert witness suggests that the Sheriff's policies and procedures are inadequate because they do not follow the Memphis Model adopted by the International Association of Chiefs of Police. That fact that the Memphis Model may be an appropriate or even ideal model for dealing with mentally unstable individuals does not mandate that all other training, policies, and procedures are inadequate.

Under the facts of this case, the Court finds that no reasonable jury could conclude that the Sheriff utterly failed to train the Deputies in how to deal with mentally unstable individuals. As such, the Court declines to apply the single incident exception to the deliberate indifference element. The Court will therefore grant summary judgment and dismiss the § 1983 claims brought against the Sheriff in his official capacity.

### B.  *Official Capacity claims against the Deputies*

To the extent that Plaintiffs bring an official capacity claim against the Deputies, Plaintiffs have failed to show that the Deputies are policy makers as necessary to establish liability for an official capacity claim. As previously explained, "Under Louisiana law, it is clear that 'the Sheriff in his official capacity is the appropriate governmental entity responsible for any constitutional violations committed by his office.'" *Causey*, 167 F. Supp. 2d at 907 (citing *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d 606, 614 (E.D. La. 1998) (citations omitted)). "Indeed, 'the sheriff in his official capacity is the appropriate governmental entity on which to place responsibility for the torts of a deputy sheriff.'" *Id.* (citing *Burge v. Parish of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999); *Thomas v. Frederick*, 766 F. Supp. 540 (W.D. La. 1991) (citations

omitted); *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So.2d 669 (La. 1981)). Therefore, to the extent Plaintiffs state a claim against the Deputies in their official capacity, those claims fail as a matter of law and are therefore dismissed.

3. Punitive Damages

Having concluded summary judgment is appropriate in favor of Defendants for Plaintiffs' claims against the Deputies in their individual capacities and the Sheriff in his official capacity, the Court concludes that punitive damages against Defendants under § 1983 are likewise not appropriate.

CONCLUSION

Accordingly

**IT IS ORDERED** that the *Motion for Summary Judgment* filed by Sidney J. Gautreaux, III, Sheriff of East Baton Rouge Parish, Lieutenant Michael Birdwell, Detective Shannon Broussard, Detective Charles Montgomery, Detective Scott Henning, Detective Christopher Masters, and Sergeant Verner Budd (Doc. 63) is **GRANTED**.

Signed in Baton Rouge, Louisiana, on June 17, 2020.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**